ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Alliance Roofing & Sheet Metal, Inc. | ) ASBCA No. 59663 |
| | ) |
| Under Contract No. N40080-12-D-0494 | ) |

APPEARANCES FOR THE APPELLANT:     Lawrence M. Prosen, Esq.
                                   Daniel P. Broderick, Esq.
                                     Thompson Hine LLP
                                     Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Ronald J. Borro, Esq.
                                     Navy Chief Trial Attorney
                                   Ellen M. Evans, Esq.
                                     Senior Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE MELNICK

The United States Navy awarded an indefinite-delivery, indefinite-quantity (IDIQ) contract for roofing work to Alliance Roofing & Sheet Metal, Inc. (Alliance). Alliance claims that the Navy directed it to provide a manufacturer's warranty for certain task orders that exceeded the contract specifications. Having appealed from a deemed denial of its claim, Alliance elects to proceed under the Board's Accelerated Procedure (Rule 12.3). A one-day hearing was held on 12 March 2015 and both entitlement and quantum are at issue (tr. 42-43).[1] The appeal is denied.[2]

FINDINGS OF FACT

1. On 6 February 2012, the Navy awarded Contract No. N40080-12-D-0494 to Alliance (R4, tab 1). The IDIQ contract required Alliance "to provide roof repair and replacement and various types of maintenance repairs" at facilities within the area of

---

[1] At the hearing the government contended that the Board should only hear entitlement, not because it was not on notice, but because the appeal was fast-tracked. The Notice of Docketing, dated 7 November 2014, stated the Board intended to decide entitlement and quantum. Appellant favored both issues to be heard and decided.

[2] Alliance filed a post-trial motion for summary judgment. The government filed a post-trial brief and a reply in opposition to appellant's motion for summary judgment. We treat the motion as a post-trial brief, decide the appeal on the complete record, and dismiss the motion for summary judgment as moot.

Washington, DC (R4, tab 1 at 5-6). The pricing schedule in the contract specifically described tasks that were to be paid on a unit price[3] basis given the Navy's estimated quantities (R4, tab 1 at 9-47). Among the clauses included in the contract were FAR 52.216-18, ORDERING (OCT 1995); and FAR 52.216-22, INDEFINITE QUANTITY (OCT 1995) (R4, tab 1 at 53-54). Also included were NFAS 5252.216-9302, INDEFINITE QUANTITY (JUN 1994); and NFAS 5252.216-9306, PROCEDURES FOR ISSUING ORDERS (MAR 2002) (R4, tab 1 at 70-71). The contract incorporated by reference FAR 52.232-5, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEP 2002); FAR 52.243-4, CHANGES (JUN 2007); and FAR 52.246-21, WARRANTY OF CONSTRUCTION (MAR 1994) (R4, tab 1 at 51-52). Performance of specific roof work was to be made by issuance of delivery orders under the contract (R4, tab 1).

2. Section 00 41 00, "BID SCHEDULES," paragraph 1.1.1 of the contract explained that "unit prices" would be "required for specifically selected work." It required that all "pre-bid line items" should include direct labor, materials, sales tax on materials, insurance, fringe benefits, rental equipment, overhead, and bond costs. Also, it was to include subcontractor insurance, fringe benefits, equipment, overhead, and profit. (R4, tab 7) The actual contract price schedule provided short descriptions of work to be performed and contractor unit prices (R4, tab 1 at 9; app. supp. R4, tab A24, ex. 1; tr. 207-08). A more detailed scope of work elsewhere in the contract described the requirements of the line items (app. supp. R4, tab A24, ex. 2).

3. The contract included two line items for Ethylene-Propylene-Diene-Monomer (EPDM) roofing material which were part of Series 07 in the pricing schedule. The first was A007AN, EPDM rubber, 60 mil, fully adhered. The other was A007AP EPDM rubber, 60 mil, mechanically fastened. (R4, tab 1 at 13; compl. and answer ¶ 14) The more detailed scope of work for these line items provided additional information about material, fastener pattern, sealant, etc. Both entries stated:

> Refer to Series 12.0 Line Items, "Roof Services," for manufacturer's warranty.

(App. supp. R4, tab A24, ex. 2 at 9) However, Series 12 was "Steel Roof Decking" not "Roof Services" and said nothing about warranties (*id.* at 18). While Series 13 was entitled "Roof Services," it similarly said nothing about warranties (*id.* at 18).

4. The contract also included specification section 07 53 23, "ETHYLENE-PROPYLENE-DIENE-MONOMER ROOFING" (R4, tab 5). That section provided that certain listed publications formed "a part of this specification to the extent referenced." The list included "AMERICAN SOCIETY OF CIVIL

---

[3] The unit prices were bid by Alliance when it submitted its proposal and accepted by the Navy upon award of the contract.

ENGINEERS (ASCE) ASCE/SEI 7-05 (2005; R 2006) Minimum Design Loads for Buildings and Other Structures." (R4, tab 5 at 1) Paragraph 1.4.4 of the section, entitled "Wind Uplift Resistance," stated:

> Complete roof covering assembly, including insulation, must be rated Class 1-90[]in accordance with FM APP GUIDE capable of withstanding an uplift pressure of 90 psf. Do not install non-rated systems, except as approved by the Contracting Officer. Provide wind load calculations and submit engineering calculations and substantiating data to validate wind resistance of any non-rated roof system. Apply wind uplift calculations based on a design wind speed of 90 mph in accordance with ASCE/SEI 7-05 or applicable building code requirements. Resistance to wind uplift for loose-laid ballasted application must be in accordance with requirements of SPRI RP-4.

(R4, tab 5 at 5) Paragraph 1.8 of that specification, entitled "WARRANTY," required Alliance to:

> Provide roof system material and workmanship warranties meeting specified requirements. Provide revision or amendment to standard membrane manufacturer warranty as required to comply with the specified requirements.

(*Id.* at 7) Paragraph 1.8.1, entitled "Roof Membrane Manufacturer Warranty," stated:

> Furnish the roof membrane manufacturer's 20 year no dollar limit roof system materials and installation workmanship warranty, including flashing, insulation, and accessories necessary for a watertight roof system construction.

The paragraph provided further that, while under warranty, if the roof system, "as installed for its intended use in the normal climatic and environmental conditions of the facility, becomes non-watertight," or fails in other specified ways, "repair or replacement...must be the responsibility of the roof membrane manufacturer." (*Id.* at 7)

5. At some point in time, questions arose within the Navy about the extent the contract required roof warranties (app. supp. R4, tabs A17-A18). This was followed by disagreement between the Navy and Alliance about the issue. Ultimately, on 17 July 2013, Ms. Alyson L. Harbage, the contracting officer responsible for award of the contract, informed Alliance of the 16 July instructions that she had given to

3

Ms. Linda B. Atchinson, the task order contracting officer. Those instructions concluded that "depending on the line item description warranties may or may not be included in the price." She noted that one line item required a "[m]anufacturer's standard 20 year limited warranty and contractor's five year performance agreement," while other line items were not so specific about their warranty requirements. Accordingly, Ms. Harbage told Ms. Atchinson that she should review the task orders and contract separately for warranties as necessary. Ms. Harbage told Alliance that it should inquire about task order warranty requirements in the future. (App. supp. R4, tabs A14, A24, ex. 16)

6. After Ms. Harbage communicated her views about the contract, the Navy issued some task order requests for procurement, accompanied by scopes of work for the replacement of building roofs with 90 mil EPDM roofing (gov't br., ex. 1; tr. 107-08). Each scope of work required compliance with UFC-3-110-03 Roofing and/or UFC-3-110-04 Roofing Maintenance and Repair (gov't br., ex. 1).[4] Alliance's proposals for all of the task orders at issue in this appeal included a 20-year manufacturer's warranty for an additional charge, which the government accepted. There was no description of the terms of the warranties. (App. br. at 5; gov't br. at 8 n.2; app. supp. R4, tab A9)

7. Starting in October 2013, Alliance began submitting sample manufacturer limited warranties from Firestone Building Products Company as part of shop drawing submittal packages. While these "Red Shield" warranties generally included coverage for the repair of any leaks in the roofs, they excluded damage caused by wind gusts exceeding 55 miles per hour. (R4, tab 37) Alliance purchased several Red Shield warranties from Firestone (app. supp. R4, tabs A2, A3, A6, A8). Some of these warranties were accepted by the Navy (tr. 118). However, on 13 November 2013, the Navy sent an email to Alliance stating that its warranty submitted on a roof at Indian Head was rejected because it "need[ed] to meet design wind loading for the regain [sic] @ 90 mph or greater" (app. supp. R4, tab A1, ex. 22). Alliance responded by stressing that the EPDM specification required "'Wind Up Lift Resistance' Class 1-90" capable "of withstanding an up lift 'pressure' of 90 psf," not a 90 mile per hour wind speed warranty (app. supp. R4, tabs A21, A24, ex. 9). In another letter, dated 9 December 2013, copied to both Ms. Harbage and Ms. Atchinson, Alliance explained that the specification's design requirement was for 90 miles per hour wind resistance, which the design met. Alliance stressed that its sample warranty met all of the requirements of the specifications. However, Navy technical personnel objected to the warranty's 55 mile per hour coverage limitation. Alliance explained that obtaining a warranty with more protection from the manufacturer would increase its costs. It inquired into whether the additional coverage was desired. (App. supp. R4, tab A13)

_____

[4] "UFC" stands for United Facilities Criteria (R4, tab 17).

4

8. In a letter to Alliance dated 17 December 2013, regarding Task Orders 82, 84, 90, 92, and 95, Ms. Atchinson addressed Alliance's contention that it had met the contract specifications. She suggested that the task orders required compliance with UFC-3-110-03 and/or UFC-3-110-04 and other applicable UFCs. She concluded that these requirements mandated a 115 mile per hour warranty for membrane roofs and a 90 mile per hour warranty for shingle roofs. Ms. Atchinson directed Alliance to proceed based on those instructions. (R4, tab 12) We find no express direction in the contract requiring a warranty protecting against wind damage as high as 115 mph.

9. On 24 January 2014, Alliance submitted a Request for Equitable Adjustment (REA) to Ms. Atchinson, assuring her that it would provide whatever the Navy requested, but seeking additional compensation and time for the cost of providing a warranty with 115 mile per hour coverage for buildings associated with Task Orders 82, 84, 90, 91, 92, 94, and 95. The request included Alliance's cost estimates for each building involved. The REA included a copy of instructions provided by Firestone for installing a roof covered by a 20 year 115 mile per hour warranty. Alliance sought $78,521.43. (App. supp. R4, tab A1, exs. 1, 21; tr. 133)

10. On 31 March 2014, Alliance executed a document releasing the government "from all liabilities, obligations and claims whatsoever in law and in equity under or arising out of" Task Orders 92 and 95. Alliance executed a similar document for Task Order 82 on 8 April 2014, for Task Order 94 on 1 July 2014 and for Task Order 90 on 3 September 2014. Each release was in consideration of payment of money by the government to Alliance. (Gov't br., ex. 2 at 20)

11. On 21 May 2014, Ms. Atchinson denied Alliance's request for an REA, relying as she had previously on her conclusion that the task orders required compliance with UFC-3-110-03 and 3-110-04, as well as the contract language that Alliance was to "[a]pply wind uplift calculations based on a design wind speed of 90 mph in accordance with ASCE/SEI 7-05 or applicable building code requirements" (app. supp. R4, tab A1 exs. 2-8). She did not rely upon the purported releases, which she did not know existed until a few days before the hearing. She testified that she had not previously been aware of those documents because invoices are paid out of the government's Wide Area Workflow (WAWF) invoicing system and she does not have to be aware of its entire contents to perform her functions. She explained that to become aware of releases she needed to check for them in the system herself. (Tr. 349-50)

12. On 16 July 2014, Alliance submitted a certified claim to Ms. Atchinson seeking time extensions of 32 days for each task order and the amount sought in the REA (R4, tab 16).

5

13. On 5 November 2014, Alliance appealed to this Board from a deemed denial of its claim.

## DECISION

Alliance contends that the Navy's direction to provide a manufacturer's warranty covering damage caused by wind as high as 115 miles per hour was a breach of contract. It argues that the underlying contract did not impose any warranty requirement for EPDM roofs. However, after Ms. Harbage opined that the contract line items lacked consistent warranty requirements, the Navy sought warranties through the contract's task orders and Alliance priced and provided 20-year Red Shield warranties for various EPDM roofs. Alliance maintains that Firestone's exclusion from those warranties of coverage for damage caused by wind gusts exceeding 55 miles per hour complied with Alliance's obligations; it was not required to provide warranties covering damage from winds as high as 115 miles per hour. Alliance seeks increased costs it claims to have incurred obtaining warranties from Firestone to meet that requirement and install the roofs.

The Navy says both the contract and the terms of the task orders required 115 mile per hour warranties for all EPDM roofs. It also suggests that Alliance has not proven what additional costs it may have incurred as a result of its direction. Finally, the Navy argues that Alliance released its claim for Task Orders 82, 90, 92, 94, and 95.

Alliance's acquiescence to the Navy's demands waived any breach claim. *See Silberblatt & Lasker, Inc. v. United States,* 101 Ct. Cl. 54, 79-80 (1944). Because Alliance's claim arises from its performance of a direction that it says was beyond the contract's requirements, it is more aptly characterized as seeking an equitable adjustment.

Regardless of whether Alliance was originally obligated under the contract to provide warranties for EPDM roofs, the Navy accepted its proposals to provide 20-year manufacturer warranties for all of the task orders at issue here (finding 6). Since the parties did not negotiate alternative warranty terms, they must have intended Alliance's task order warranties to comply with the specifications in IDIQ section 07 53 23, paragraph 1.8.1 (finding 4). However, nothing in that provision, or in the language of any of the other materials relied upon by the government, required Alliance to provide a warranty covering damage resulting from winds as high as 115 miles per hour. Even if the Class 1-90 rating requirement in paragraph 1.4.4, or UFC-3-110-03 and/or UFC-3-110-04, imposed a performance requirement to withstand 115 mile per hour winds, which the Navy has not proven, it would not be a warranty.

Having established that the Navy's directive to Alliance to provide 115 mile per hour warranties was beyond its contractual obligations, to recover Alliance must prove it

suffered injury resulting from the order, such as extra costs associated with obtaining the higher rated warranties rather than the 55 mile per hour Red Shield warranties, extra installation costs, or additional related costs. *See Servidone Construction Corp. v. United States,* 931 F.2d 860, 861 (Fed. Cir. 1991) (explaining that recovery of an equitable adjustment requires a showing of liability, causation, and resulting injury). Alliance has not demonstrated such costs. The closest Alliance has come to showing how much extra it might have paid Firestone for the 115 mile per hour warranties were its own estimates of those costs that it included with its REA (finding 9). While Alliance did produce invoices showing it purchased several Red Shield warranties (finding 7), it did not produce any correspondence, invoices, or other evidence specifically demonstrating any actual additional costs it may have paid for the 115 mile per hour warranties. Similarly, although Alliance produced documentation from Firestone specifying how a roof to be given a 115 mile per hour warranty was to be installed (finding 9), it failed to demonstrate extra labor and material costs it incurred for that reason, over and above the installation costs it incurred for the Red Shield warranties.

## CONCLUSION

For the reasons stated, the appeal is denied.[5]

Dated: 4 May 2015

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

---

[5] The Navy's allegation of release is an affirmative defense that it would bear the burden to prove in the event the elements of Alliance's claim were established. *See Shell Oil Co. v. United States,* 751 F.3d 1282, 1297 (Fed. Cir. 2014). Given this outcome, we perceive no need to decide the affirmative defense.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59663, Appeal of Alliance Roofing & Sheet Metal, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
